UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:13CR 53 AGF |
| | ) | |
| STEVEN WAYNE VANCE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

The defendant has filed three pretrial motions: Defendant's Motion to Dismiss Count II of the Indictment for Insufficiency and Failure to State a Cause of Action (Document #29); Motion to Suppress (Document #30); and Motion for Bill of Particulars and Notice of Alibi Defense (Document #31).

The court will address the motions in the order in which they were filed.


## Motion to Dismiss Count II

Defendant Steven Wayne Vance filed Defendant's Motion to Dismiss Count II of the Indictment for Insufficiency and Failure to State a Cause of Action and Notice of Intent to Challenge Constitutionality of 18 U.S.C. 922(g)(3) (Document #29).

The defendant is charged in Count II of the Indictment with being an Unlawful User of a Controlled Substance in Possession of a Firearm. In his motion, defendant states:

> 3. Through disclosure, it appears the Government alleges Defendant to be an
>
> "unlawful user" of a controlled substance because he has been charged in Reynolds

County, Missouri with possession of a controlled substance.

   4.  The Reynolds County, Missouri charge stems from a December 23, 2011, contact with a Reynolds County Deputy, who allegedly found a black tube in Defendant's pocket that allegedly contained a trace amount of methamphetamine.


  The motion continues that on April 3, 2012, defendant voluntarily met with a Forest Service Agent.  During the contact, the agent removed a .325 caliber Browning rifle from defendant's vehicle, then retained it as evidence because of the Reynolds County, Missouri, possession charge.

  Defendant alleges that the government makes no allegation in disclosure that defendant possessed any illegal drugs or was under the influence of any illegal drugs on the date Agent Heine confiscated the .325 caliber Browning rifle.  The defendant claims that there is no allegation of a "temporal nexus" between defendant's alleged drug possession and the firearm possession on March 23, 2012.  The defendant argues that there is no allegation apart from the single instance of the alleged possession of a controlled substance on December 23, 2011, that the defendant is a user.

  Title 18, United States Code, § 922(g)(3) states:  "It shall be unlawful for any person-- ... (3) who is an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)); ... to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; ...."

  In his motion, the defendant refers to disclosure.  Under our local rules, the disclosure is not filed with the court, so the court has not seen the disclosure.

  The defendant argues further that the government makes no allegation in disclosure that defendant possessed any illegal drugs or was under the influence of any illegal drugs on the date

Agent Heine confiscated the .325 caliber Browning rifle. Again, the defendant claims through the disclosure that three months elapsed from the time of the alleged possession of a trace amount of a controlled substance in Reynolds County, Missouri, and the time when the government alleges the defendant to be in possession of the Browning rifle.

The statute does not require any specific time that a violator of the statute be an unlawful user or addicted to any controlled substance but instead states that anyone who is an unlawful user or is addicted and possesses a firearm or ammunition violates the statute. The indictment does not allege "on December 23, 2011," and does not link the possession of a firearm to any specific time other than that when he possessed the rifle he was a user of a controlled substance.

It is the defendant who is claiming that it is the government's position that the possession of the trace amount of drugs on December 23, 2011, supplies the date for the use of a controlled substance in connection with the possession of a firearm. Neither the statute nor the indictment says that.

The government cites United States v. Richard, 350 Fed.Appx. 252, 2009 WL 3367632 (C.A.10 (Okla.), in its response to defendant's motion (Document #37). At page 4, the government quotes the Richard case:

> An unlawful user of a controlled substance is an individual who, on a regular and ongoing basis, uses a controlled substance in a manner other than that prescribed by a licensed physician.
>
> For the defendant to possess a firearm "while" he was an unlawful user of a controlled substance does not require that the defendant used the controlled substance at the precise time he possessed the firearm. The defendant is not required to have used illegal drugs on a particular day, or within a matter of days before the possession of the firearm. Nor is the defendant required to have been under the influence of an illegal drug at the exact same time that he possessed the firearm. For the defendant to have possessed the firearm "while" he was an unlawful user of a controlled

substance means that the defendant must have possessed the firearm during the same time period that he was a regular and ongoing unlawful user of a controlled substance.

Richard, 350 Fed.Appx. at * 8.

In the Richard case, the Tenth Circuit found that § 922(g)(3) is not unconstitutionally vague. The court does not know what evidence the government will use to prove that Mr. Vance was a user of a controlled substance during his possession of the firearm. That has to await the trial.

The defendant argues further "As the statute is applied to Defendant in this case, it did not provide Defendant, or any person similarly situated as Defendant, with sufficient notice that the manner and extent to which him being charged with allegedly possessing a trace of methamphetamine on December 23, 20111, qualified him as an 'unlawful user ... of a controlled substance' to preclude him from possessing a firearm on March 23, 2012." (Document #29, ¶ 14), p. 3).

Again, the statute does not tie the possession of the firearm to the defendant's being a drug user on any specific date, nor does the indictment. As the Richard case stated, "The defendant is not required to have used illegal drugs on a particular day, or within a matter of days, before the possession of the firearm. Nor is a defendant required to have been under the influence of an illegal drug at the exact time that he possessed the firearm. For the defendant to have possessed the firearm 'while' he was an unlawful user of a controlled substance means that the defendant must have possessed the firearm during the same time period that he was a regular and ongoing unlawful user of a controlled substance." Id.

The defendant would know if he was a regular and ongoing unlawful user of a controlled substance during the same time period that he possessed the firearm. The statute does not impose an unconstitutional burden on Mr. Vance of trying to figure out whether he was an "unlawful user"

and whether he was a person in possession of a firearm. The statute is not "subject to the whimsical interpretations of individual law enforcement agents."

Neither the statute nor the indictment is unconstitutional on the basis of vagueness. The Defendant's Motion to Dismiss Count II (Document #29) should be denied.

## Motion to Suppress

The defendant has filed a Motion to Suppress (Document #30) asking that an order issue suppressing from the use in evidence items taken from defendant's person, property, premises and/or automobile or in which the defendant had a right or interest as well as the suppression of all evidence of said search and/or seizure and the fruits thereof and for the return of said items seized.

The parties have prepared memoranda both before and after an evidentiary hearing and have considered questions involved in the motion to suppress in connection with dates of contact that Mr. Vance had with law enforcement officers.

## General Factual Background

**Initial Investigation.**

On October 29, 2011, a wildfire was reported on Forest Service property in Reynolds County, Missouri, near the Sutton Bluff Campground area. Forest Service staff responded and discovered a fire in that area on the Mark Twain National Forest. The fire burned approximately 10 acres of Forest Service land and about 54 acres of a private parcel of property owned by Dennis Vance. After making sure the fire was put out, the Forest Service officers tried to determine where the fire started. Their investigation revealed that the fire appeared to have started on the Vance property and migrated

to the Forest Service property. The Dennis Vance property consists of approximately 120 acres. That property was mostly fields, but contained around 40 acres of woodland.

While the United States Forest Service employees were extinguishing the fire, they observed some tree stumps on the Forest Service property that had been recently cut. The employees were aware that no timber contracts had been awarded on this tract of property. The trees that were cut were located near the border to the Dennis Vance property. An investigation started as to who was responsible for the loss of the timber. The officers noted that there were skid mark trails made by a log skidder moving timber from the stump locations to the Dennis Vance farm. The skid trails crossed an area of fence marking the border of the Dennis Vance farm. The officers eventually determined that 945 trees were illegally removed from this tract of timber. The officers also discovered that, during the time of the timber theft, Steven Vance had been cutting timber on the Dennis Vance farm. Dennis Vance is Steven Vance's father. In the remainder of this report and recommendation, Steven Vance will be referred to as "Vance" and the father will be identified by his full name, Dennis Vance.

After beginning his investigation, Forest Service SA Heine learned several things about Vance, including that he had a reputation in the community for using and manufacturing methamphetamine. Heine learned that Vance was arrested on December 23, 2011, in Reynolds County for possession of items commonly used to manufacture methamphetamine.

**December 23, 2011, Contact.**

**<u>Facts Specific to December 23, 2011</u>**

Just after midnight on December 23, 2011, Reynolds County Deputy Sheriff Randall Martin was patrolling in Reynolds County, Missouri. As the officer approached Cindy's Quick Stop at the Junction of Highway 21 and V, he noticed a vehicle sitting on the parking lot. The business has a rental storage building area adjacent to the convenience store. The deputy knew that the business had been the victim of a burglary and other thefts. The deputy decided to stop and check the vehicle, which was a Pontiac Sunfire. The deputy stopped his vehicle 10 to 20 feet from the Sunfire at a right angle to the other car. The deputy parked his car in that fashion so that he could use his vehicle's headlights for illumination. The deputy's car was not blocking the exit path of the Sunfire. Deputy Martin got out of his vehicle and walked up to the Sunfire. The driver appeared to wake up as soon as Martin got close. Martin made contact with the driver, who identified himself as Steven Vance. Vance told the officer that he had stopped at the business to take a nap before driving on to this residence at Van Buren, Missouri. Martin asked for, and received, Vance's driver's license. Deputy Martin walked back to his patrol car, contacted his dispatcher and asked for a records check. Vance was left alone in his vehicle while the officer checked Vance's record. The dispatcher reported that there was an active arrest warrant for Vance from Shannon County for passing bad checks. The dispatcher confirmed the validity of the warrant with Shannon County. Deputy Martin asked for another deputy to drive to his location since he was going to arrest Vance.

Deputy Hampton drove to that location to assist Deputy Martin. The two officers approached the Sunfire and asked Vance to step out of the car. Martin told Vance that he was under arrest for the Shannon County arrest warrant. Officer Martin patted Vance down. He found a black plastic

pen in Vance's right front pocket. When the officer opened that pen, he found a white, powdery residue inside. That residue field-tested positive for methamphetamine.

Deputy Hampton transported Vance to the Reynolds County jail for processing. Deputy Martin notified the dispatcher to have a wrecker service tow the vehicle to a secure location. The Reynolds County Sheriff's Office has a policy that they will search any vehicle that is towed from its roadside location prior to it being stored in order to list and secure items of personal property left in the vehicle. All vehicles are towed when the driver is arrested, and no one else is present to drive the vehicle, and the vehicle is impeding the flow of traffic. Martin conducted the inventory search on the parking lot before th tow truck arrived. When Martin looked in the front driver's floorboard, he found a Wal-Mart bag that contained a 32-ounce can of Coleman camp fuel and a measuring cup. Martin looked in the trunk and found a 32-ounce container of muriatic acid. All of these items have some legal uses but are also some of the basic components to manufacture methamphetamine and are commonly found in this area in association with illegal methamphetamine laboratories.

The black plastic pen was submitted to the Missouri State Highway Patrol Crime Laboratory. That laboratory confirmed that the white residue in the pen was methamphetamine.

## Discussion

The defendant contends that evidence seized from Vance's person and his vehicle after his arrest and search on December 23, 2011, should be suppressed. As grounds, he states: (1) the detention of Vance was illegal, unconstitutional and unreasonable and that no offense was being committed in the officers' presence; (2) the detention was made without reasonable suspicion and the detention was without legal justification; (3) the search and seizure was made incidental to the arrest and not for the officers' protection; and (4) the officer was not making a reasonable and valid

inventory of the defendant's vehicle, but made a warrantless search and seizure.

With regard to the December 23, 2011, contact, the defendant alleges that after Deputy Martin learned that defendant had stopped to take a nap before continuing on to Van Buren, Missouri, where his home is, he should have terminated the contact at that point. Defendant argues that Deputy Martin detained the defendant at the location until he performed a records check on Mr. Vance. After the records check and learning that the defendant had an arrest warrant from Shannon County, Deputy Martin arrested the defendant and upon searching the defendant, found a black plastic pen tube which contained a white residue that field-tested positive for methamphetamine.

Deputy Martin called for assistance in connection with Mr. Vance's arrest. Deputy Hampton answered the call and transported Mr. Vance to the Reynolds Office for booking. Deputy Martin conducted what he called an inventory of the vehicle before it was towed by Hills Motors. According to Deputy Martin, he located in the front driver's floorboard in a Wal-Mart bag containing a red container with 32 ounces of Coleman fuel, a measuring cup and a 32-ounce container of muriatic acid in the trunk. The items located in the vehicle and the black pipe were photographed and seized for evidence.

The defendant argues that detention of the defendant by Deputy Martin was illegal in that at the time the detention was made no offense was being committed in the officer's presence and the detention was made without reasonable suspicion or legal justification. The defendant alleges that Deputy Martin did not make a reasonable and bona fide inventory or inspection of the defendant's vehicle, but instead made a warrantless search and seizure. The defendant states that the search of the defendant's person and vehicle and/or seizure were the fruits of a previous illegal arrest, detention and/or intrusion. (Document #30, pp. 5-6).

It is the defendant's position that Deputy Martin had no reason to hold the defendant's driver's license or take any additional steps once he confirmed the defendant's identity. There was no probable cause or suspicion at that point to warrant the seizure/detention that occurred. Defendant was merely taking a nap in his car on a parking lot of a truck stop that allows overnight sleeping in vehicles. Accordingly, based upon the Fourth Amendment as applied in United States v. Lopez, 443 F.3d 1280 (10th Cir. 2006), and United States v. DeLaCruz, 703 F.3d 1193 (10th Cir. 2013), the evidence of the search and all items seized on December 23, 2011, and the fruits thereof should be suppressed from evidence in this cause of action. (Document #61, p. 12).

The government in its Response to Defendant's Post-Hearing Memorandum elaborated on the factual situation at Cindy's Quick Stop.

Martin was on duty as a deputy sheriff just after midnight on December 23, 2011. He was patrolling an area of Reynolds County near the Junction of Highways 21 and V, near a business known as Cindy's Quick Stop. That business has a gas station and a convenience store in one building and offers rental storage units in a separate building on the same property. The storage units are located on a small rise away from the convenience store. There are somewhere between 10 and 30 rental units at the property. The property is visible from the junction of the highways. Martin was alone in his patrol car and it was dark outside. (Tr., pp. 15-17).

Martin observed a vehicle parked on the parking lot near the storage unit building. It was approximately 50 to 100 feet from the convenience store and 30 to 40 feet from the storage units. The vehicle did not have its headlights on and was parked by itself. Martin was aware that the business at that location has suffered a major burglary and some gas thefts in the past. The gas thefts occurred at night. Martin had assisted in the investigation of the gas thefts. The burglary had

occurred about a year to a year and a half before December 23, 2011. Deputy Martin knew that truck drivers sometimes slept on the parking lot, but no one else did. Martin decided to check to see if anyone was inside the vehicle. Martin pulled his patrol car into the parking lot of the business and parked his car at a right angle to the other vehicle, with his headlights shining on the other driver's door. The other vehicle was a Pontiac Sunfire. Martin did not recognize the vehicle and did not know who its owner was. The patrol car did not block the exit path of the Sunfire. Martin's vehicle was between 10 and 30 feet from the Sunfire. (Tr., pp. 17-19, 39, 40, 51, 52). At that time, Martin was not aware of any criminal activity occurring at the business. (Tr., pp. 40-41).

When Martin stopped his patrol car, he did not see anyone in the Sunfire. Martin got out of his car and started walking to the Sunfire. As Martin approached the Sunfire, he observed a person partially reclined in the seat, sleeping in the car. The person appeared to wake up. Martin motioned for the person to roll the window down. The driver complied with that request. Martin asked the driver for his identification and asked what he was doing there. The driver's license was for Steven Vance, who was the driver of the Sunfire. Vance told the officer that he was stopped there to take a nap before heading to his home. Martin walked back to his patrol car with Vance's driver's license to check Vance's status with his dispatcher. Vance was not handcuffed or physically restrained. Martin told Vance to "wait there" and that he would be right back. Martin generally informs people that he is going to run their driver's license records when he takes them and believed that he did on this occasion. (Tr., pp. 19-22, 44, 45).

Martin went back to his patrol car and asked the dispatcher to run Vance's driver's license information. The dispatcher reported back that there was an active arrest warrant from Shannon County, Missouri, for Vance. The dispatcher had checked with Shannon County to verify that the

arrest warrant was still valid. Martin asked the dispatcher to send another deputy to his location to assist him. Deputy Kelly Hampton arrived within three to seven minutes after that request, since the location of the contact with Vance was only about two miles from the sheriff's office. Martin did not know Vance but was familiar with his name. (Tr., pp. 19-24, 32, 33, 45, Exh. 1).

When Hampton arrived, both Martin and Vance walked up to Vance's car. Martin informed Vance of the arrest warrant and that he was under arrest. Martin asked Vance to step out of the car, which Vance did. Martin searched Vance incident to the arrest. Martin located a pen tube inside Vance's right front pant pocket. The tube contained a white residue. Martin was trained in the use of field tests to determine if substances were controlled substances. He performed a field test on the residue. The field test resulted in a positive result for methamphetamine. The pen tube was later submitted to the Missouri State Highway Patrol Crime Laboratory. That laboratory confirmed that the residue was methamphetamine. Martin did not ask Vance any questions about the pen tube or the methamphetamine. Vance was transported back to the Reynolds County Sheriff's Office by Deputy Hampton. (Tr., pp. 24-27, 34, 35, 37, Exh. 2, 4).

As both parties agree, the central question is whether the continued detention of the defendant to check for the driver's status and for warrants was an illegal detention as argued by the defendant or the pursuit of a Terry stop justified by reasonable suspicion as maintained by the government. (Document #61, p. 12 (Defendant); Document #64, pp. 7, 8 (Government)).

The government agrees with the defendant that what begins as a consensual encounter between the police and a citizen may turn into a seizure when an officer takes a suspect's driver's license and leaves the suspect to check for warrants in his patrol car radio. At that point the citizen is not free to go. The seizure represented by a further detention may be reasonable and justifiable

if there is a reasonable suspicion supported by articulable facts that criminal activity may be afoot.

United States v. Morgan, 2013 WL 4798896 (8th C ir. 2013) * 2 citing United States v. Sokolov, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968).

In Morgan, the opinion described the circumstances facing the officers in that case:

> At approximately 12:45 a.m. on April 17, 2012, Officers Aram Normandin and Josh Downs of the Omaha Police Department were patrolling 24-hour businesses in response to robberies in the area. In their patrol car, the officers observed a vehicle with tinted windows parked at the far corner of a grocery store parking lot. Normandin testified that the occupants of the vehicle were "ducked down," so he and Downs "decided to get out and see what was going on." As the officers approached the vehicle, the person in the driver's seat sat up and reached under his seat with both hands.

Id., at * 1.

The government in the instant case provides the following articulable facts which, the government contends, provide reasonable suspicion for the investigatory detention of Mr. Vance.

At the time that Deputy Martin asked for Vance's driver's license, he knew (1) the business known as Cindy's Quick Stop had been the victim of a nighttime burglary and nighttime gas thefts within the past year; (2) that there was a vehicle parked on the business's parking lot between the convenience store and a rental storage unit building; (3) that it was night, in fact, just after midnight; (4) that the business was closed; (5) that truckers sometimes slept overnight on the lot, but no one else did; (6) that the car was parked about 100 feet from the convenience store and about 30 to 40 feet from the nearest rental unit. (Document #64, p. 6).

Additionally, the court notes that while the business was closed for the night, there was 24-hour access to the storage units. The parked car had its lights out. The car was one the deputy did not recognize. When Deputy Martin was approaching the vehicle which was lit up by Martin's

headlights, no one in the vehicle was visible. The driver appeared to wake up as soon as Martin got close. The Quick Stop was located at the intersection of Highways 21 and V which would provide easy flight if one were to commit a burglary or theft.

In connection with reasonable suspicion, what the officer considers is not only the "specific and articulable facts" but also "rational inferences from those facts," which taken together "reasonably warrant the intrusion." Terry, 392 U.S. at 21. Courts afford considerable deference to the observations and conclusions of the police, reasoning that an experienced office can infer criminal activity from conduct that may seem innocuous to a lay observer. United States v. Arizona, 234 U.S. 266, 277 (2002); United States v. Lopez-Mendoza, 601 F.3d 861, 865-66 (8th Cir. 2010).

Considering the totality of circumstances, the court finds Deputy Martin had sufficient articulable facts to provide reasonable suspicion that criminal activity might be afoot. Morgan, supra, at * 2, justifying the detention of Mr. Vance long enough to check with the dispatcher concerning Mr. Vance's driver's status.

Because the dispatcher reported an outstanding warrant against Mr. Vance from Shannon County, Missouri, the dispatcher checked with Shannon County to make sure the warrant was still active. Because he was by himself and was going to make an arrest, Deputy Martin asked for another deputy to come to assist. (Tr., p. 23). About five to seven minutes elapsed between the time Martin first made contact with Mr. Vance and the second deputy arrived. Id.

Deputy Martin informed Mr. Vance of the warrant and told him he was placing him under arrest. Martin asked Mr. Vance to exit the car. After handcuffing Vance, the deputy patted him down and found in his right front pocket a pen tube. The deputy pulled out the tube and saw white residue in it. (Tr., p. 25). The residue field tested positive for methamphetamine. (Tr., p. 26). Mr.

Vance did not make any statements.

Because the investigatory detention of Mr. Vance to check his driver's status was legal, confirmation of the active warrant led to Mr. Vance's arrest. A search pursuant to the arrest was proper, leading to the discovery of the tube containing the methamphetamine residue. The tube was sent to the Highway Patrol Laboratory which confirmed that the substance was methamphetamine. (Tr., p. 26).

The tube and the methamphetamine should not be suppressed.

## Inventory Search

The second objection the defendant raises with regard to the contact between Deputy Martin and Mr. Vance on December 23, 2011, is the inventory search which Deputy Martin testified he performed, during which he found a 32-ounce container of Coleman fuel, a measuring cup and 32 ounces of muriatic acid. The defendant argues that Deputy Martin did not conduct the inventory search according to policies and procedures of the Reynolds County Sheriff's Department. "Instead as the testimony showed, Deputy Martin's search was merely pretext for an investigatory search in an attempt to discover incriminating evidence." (Document #61, p. 13).

The defendant cites United States v. Taylor, 636 F.3d 461, 464 (8th Cir. 2011). In Taylor, the arresting officer had the driver's vehicle towed according to policies of the police department. Id., p. 63. As part of the policies of the police department, the officer was required to make a report detailing and listing all items located inside the vehicle being towed. Rather than following this policy, the officer did not itemize the hundreds of pieces of tools and equipment found in the inventory. Instead, the officer just wrote "misc. tools." During the search, the officer found approximately 74 grams of powder cocaine. Id. The Eighth Circuit Court of Appeals suppressed the

evidence, finding that the search was not a valid inventory search. Id. at 466. The Court found the officer did not follow the standardized procedures for inventory searches of her police department. Since the officer did not make a detailed list of the items found during the search, it was insufficient to remove the inference that the search was investigatory. Id.

As the defendant points out, Deputy Martin did not follow his department's standardized procedures for an inventory search. After the defendant's arrest, Deputy Martin made the decision to have defendant's vehicle towed. Before the vehicle was towed, however, Deputy Martin did an inventory search of the vehicle. Following the search, Deputy Martin filled out an inventory form listing only 32 ounces of Coleman fuel, a measuring cup and a white 32-ounce container of muriatic acid. At the suppression hearing, Deputy Martin testified that the procedures and policies in place at his department require him to note anything of value to make sure everything is documented when doing an inventory search. (Tr., p. 30). The items listed on the form, however, are not the only items found by Deputy Martin during the inventory search of defendant's car. Deputy Martin admitted that the items he seized were not all that he found in the vehicle. There were toys in the back seat and it is possible, as suggested by defendant's attorney, that there were clothes in the back seat and trunk. (Tr., p. 49). To that, Deputy Martin stated he did not recall. There was change and money in the cupholders. Asked if he inventoried everything that was in the vehicle as required by his policy procedures, Deputy Martin responded, "I would say no." (Tr., p. 49).

Deputy Martin was asked what the reason was why he selected the three items he did. He answered, "Well, I was seizing the items; therefore, they were added as inventory that I seized them." He was asked, "... you were inventorying it for the purpose of seizing items, not for the purpose of finding out what's in the car?" Deputy Martin answered, "On this one, I inventoried what I seized.

Okay." He was asked if that was the way he did all of them. He responded, "No longer, no." "Q. Okay. Why no longer? A. Because it's improper. Q. Okay. So you agree that the inventory the way you did it was improper; correct? A. On this case, yes. Yes." (Tr., pp. 50-51).

The court would tend to agree with the defendant, that if the inventory search is the only justification for Deputy Martin's seizing the items found in the defendant's vehicle, then those items should be suppressed. However, that is not the end of the matter.

In Arizona v. Gant, 556 U.S. 332, 129 S.Ct. 1710 (2009), the Court held, based on "circumstances unique to the vehicle context" that it is proper to allow vehicle searches incident to arrest when "it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." Gant, at 343, 1719. The Supreme Court cited New York v. Belton, 453 U.S. 454, 460 (1981); Thornton v. United States, 541 U.S. 615, 632, 124 S.Ct. 2127. See also United States v. Williams, 616 F.3d 760, 765-66 (8th Cir. 2010) (search of plastic bag in arrestee's passenger compartment valid as incident to arrest). In Williams, the Eighth Circuit held "The offense of arrest will supply the basis for searching the passenger compartment of the arrestee's vehicle and any containers therein." Williams, at 765. In Mr. Vance's case, the defendant was arrested for possession of methamphetamine when the tube with methamphetamine residue was found in his pants pocket. It was appropriate under Gant, Thornton and Belton to conclude that other evidence of drug possession and use would be contained within the vehicle. It was proper for Deputy Martin to search the interior of the defendant's vehicle for further evidence of illegal drug possession and use. The validity of the search did not depend upon Deputy Martin's intent to make an inventory search. The subjective intentions of police are irrelevant to the constitutionality of an investigatory stop under the Fourth Amendment. Whren v. United States, 517 U.S. 806, 811-813 (1986); United States v.

Randolph, 628 F.3d 1022, 1025 (8th Cir. 2011).

The seizure of the Coleman fuel, the measuring cup and the muriatic acid did not violate the Fourth Amendment. These items should not be suppressed.

**April 3, 2012, Contact.**

### Statement of Facts Specific to April 3, 2012

On April 3, 2012, United States Forest Service SA Scott Heine seized a firearm from Vance while both were at a rural parcel of property in Reynolds County, Missouri. The reason for that contact was a fire investigation being conducted by Heine.

Heine is a special agent with the United States Forest Service. He investigates crimes occurring on Forest Service property. A forest fire had occurred affecting Forest Service property near the Sutton Bluff area in Reynolds County, Missouri. The fire burned about 10 acres of Forest Service property and around 54 acres of private land bordering the Forest Service property. That property was owned by Dennis Vance, the father of Steven Vance. The total acreage of the privately owned parcel was 120 acres. It was mainly pasture, with around 40 acres of woods. The fire appeared to have originated from the Dennis Vance property and migrated to the adjoining Forest Service property. A Forest Service fire suppression crew was summoned, but most of the fire had been extinguished before they arrived. However, some of the fire suppression crew noticed cut tree stumps in the burned area. The logs from those tree stumps had been removed. The fire suppression crew knew that the area had not been legally logged by any timber buyer as that area did not have a timber sale. Heine went to the scene and noticed that the stumps appeared to have been cut two to three years earlier than the fire. Heine and other Forest Service employees surveyed the trees cut on

Forest Service property that adjoined the Dennis Vance farm and found that 945 trees belonging to the United States had been cut without authorization. (Tr., pp. 53-59).

Heine also discovered skid trails and other evidence that showed that the logs had been dragged from their stump sites to the Dennis Vance property, crossing the farm's boundary line. That line had been marked by a barbed wire fence and other Forest Service boundary markers. There were no skid trails for logs being taken to any other area. (Tr., pp. 59-61).

Heine spoke with other law enforcement officers about Steven Vance. The other officers informed Heine that Vance had a history of methamphetamine use and manufacture. The source of that information was interviews conducted by those officers with confidential informants. Those informants said that Vance was manufacturing methamphetamine and that Vance and his associates were purchasing pseudoephedrine in order to manufacture methamphetamine. Heine reviewed the NPLEX database and learned that Vance had numerous purchases of pseudoephedrine in amounts too large to be used legitimately. Some of those purchases were made near the time of the contact. Heine learned that Vance had been arrested by Reynolds County deputies and had been charged with Possession of a Controlled Substance. Heine learned of all that information before his meeting with Vance on April 3, 2012. (Tr., pp. 61-63, 108, 109, 111, 146).

Heine made telephone contact with Steven Vance and arranged that Vance would meet him at the Dennis Vance property on the afternoon of April 3, 2012. Vance stopped his vehicle on an unimproved dirt road leading to a gate that led into the Dennis Vance farm. That gate was locked. Heine got out of his car and walked up to the Steven Vance vehicle. There was a passenger with Vance. Heine, Vance and the passenger, Zachary Basham, introduced themselves to one another. Vance walked to unlock the gate. When Vance opened his car door to get out, Heine observed a rifle

in the passenger compartment of Vance's car. The rifle was pointed at the floor and was near the console on the front passenger side. Heine believed that the rifle was larger than a .22 caliber. (Tr., pp. 64-70).

Heine made a statement that the rifle appeared to be a large caliber rifle. He made that statement in order to let the two people know that he knew there was a firearm in the vehicle. Heine was also armed with his service pistol, but he did not draw that pistol at any time during his contact with Vance. When Heine made his statement, Basham replied that the rifle was a "308," which Heine took to mean that the rifle fired .308 caliber ammunition. Heine assumed that the rifle belonged to Basham, based on where it was located in the vehicle. That rifle was not seized. (Tr., pp. 70-72).

At that time, Vance was walking back from unlocking the gate. Vance stated that they had the firearm in the vehicle because of mountain lions in the area. Then Vance told Heine that he had even a bigger one that was a .325 caliber. Vance walked past Heine, opened the rear, driver's side door of the Vance vehicle and removed a rifle magazine. Heine saw a round of ammunition in the magazine. Vance took the round out and handed it to Heine. While this was going on, Heine looked into the rear passenger compartment of Vance's vehicle and observed a rifle barrel that was partially covered. At that time, Heine had not asked Vance to search his vehicle, nor had Heine asked any questions about whether Vance had a rifle. Heine did not seize the rifle at that time. (Tr., pp. 72-76).

Vance and Heine walked around 200 to 250 yards to the area burned by the fire. Basham drove the Vance car to a cabin located on the Dennis Vance property. Vance told Heine how he had fought the fire and the location of various places associated with the fire. Vance and Heine started walking back toward the cabin. They walked past a place on the Dennis Vance property where logs had been burned. The logs appeared to be pieces of logs that were not marketable Heine asked

Vance about any logging on the Dennis Vance property. Vance told Heine that Vance had logged

the timber from the Dennis Vance farm after a storm that occurred in 2008. Heine was aware that

the storm that Steven Vance spoke of actually occurred in 2009. Heine asked a few other questions

of Vance about the fire. Vance became somewhat defensive about the questions being asked and

stated that the officer was accusing him of the timber theft.

In Deputy Martin's words:

> And he started becoming agitated. And I was out there by myself. There was two of those. And I started – we started walking back – or I started funneling him back towards the residence and the cabin, because I knew it was time for me, you know, to start moving on.

> Q.  Okay.  And eventually did you and Mr. Vance make it back to the cabin that's located on the Dennis Vance property?

> A.  Yes.  Well, ultimately that's where the – at that point was the vehicle – Basham had parked the vehicle between the residence and the cabin there on the Dennis Vance property.  And at that point when I got back to that vehicle is when I seized that firearm that was in there.

(Tr., p. 83).

Asked if he had made any announcement to Mr. Vance about taking the firearm or whether

he just went ahead and took it, Martin answered:

> No.  Because we was walking back I specifically – I called – it was Steve Vance and Zach Basham and myself were kind of walking – meandering back to the – towards the cabin there, and I told Steve – I told Steve to, you know, come over here beside me out of the company of Mr. Basham.

> And at that point is when I told – I asked – I asked Steve, I said, are you – are you under any charges in Reynolds County?  And he's like, what are you talking about?  And I said, Are you under a felony indictment for drug charges in Reynolds County?  And he said, Yes, but I'm not here to talk about that.

(Tr., pp. 83-84).

Deputy Martin said that based on the fact that he is under a felony indictment for drug charges in Reynolds County, Martin said he was going to seize the rifle that was in his vehicle. They argued about whether the officer was going to seize the rifle or not. Martin then said, "If I have to get the sheriff out here, I'll get the sheriff." The defendant said, "Well, you're going to have to do that." Then Steve Vance told Basham, who is still within a few feet, to get his cell phone and call his lawyer. That was done and Mr. Vance spoke with his attorney.

After the call, Steve Vance hung up the phone and said, "Take it, do what you got to do. I've got nothing else to say to you." (Tr., p. 86). At that point, Martin walked back to the vehicle and Steve Vance "kind of veered off away from me." Martin then told Mr. Vance, "I'm going to seize it, but I need to give you a receipt for the firearm, because I was seizing it as evidence." Mr. Vance said, "I don't want the receipt." (Tr., p. 85). Martin seized the rifle. Id. Eventually, Deputy Martin gave Mr. Basham a receipt to give to Mr. Vance. (Tr., p. 86).

The firearm that was seized, a Browning Arms BLR LT WT Caliber .325 WSW with a scope and a magazine with one Winchester .325 WSW center fire rifle cartridge. The firearm seized that day is the firearm listed in Count II of the Indictment.

The government claims that a rifle was seized under the plain-view doctrine, which provides that police are permitted to seize evidence without a warrant when: (1) the officer did not violate the Fourth Amendment when arriving at the place from which the evidence could be plainly viewed; (2) the object's incriminating character is immediately apparent; and (3) the officer has a lawful right of access to the object itself. United States v. McManaman, 673 F.3d 841, 848 (8th Cir. 2012). Both attorneys cite the McManaman case for the law of the plain view doctrine. (Document #64, p. 20; Document #61, p. 18).

The defendant alleges that Special Agent Heine violated the Fourth Amendment in arriving at the place from which the firearm could be plainly viewed and he did not have lawful right of access to the object itself. Defendant's claim that Officer Heine violated the Fourth Amendment in arriving at the place from which the firearm could be plainly viewed is incorrect. In fact, he parked outside the Vance property. (Tr., p. 68). After he arrived, Steve Vance parked right beside Heine's vehicle and walked to the gate and unlocked it. Id.

When Steven Vance opened the door of his car to go to the gate, he left the door open and Agent Heine could see a large caliber rifle sitting on the left side where the passenger would have been with the barrel pointed out up against the center console. (Tr., p. 69). Agent Heine remarked that it was a large caliber rifle sitting there. Mr. Basham responded that it was a .308-caliber rifle. Agent Martin assumed the weapon belonged to Basham. At that point, Mr. Vance was coming back from unlocking the gate. He then said, "I've got even a bigger one," and then he said it was a .325. Mr. Vance then walked past Deputy Martin close to the rear driver's side passenger door, opened it up and reached into the vehicle and removed a magazine and he took a cartridge out and handed the cartridge to Agent Heine. While he was doing this, Agent Heine observed a rifle barrel in the back seat partially covered what he recognized to be a rifle barrel. (Tr., p. 73). Vance handed Heine the rifle cartridge. Heine examined it and saw it was a .325 WSX Winchester cartridge, and at that point, he handed it back. Vance put the cartridge back in the rifle magazine and put the rifle magazine back in the back seat and shut the door.

Agent Heine was where he had a right to be since he was there by appointment. It was at that vantage point that he observed the rifle.

Before Heine seized the rifle, as mentioned earlier, Mr. Vance had admitted that he was under

a felony indictment from Reynolds County. Agent Heine was aware of Title 18 United States Code § 922(n), which declares that it is a crime for anyone who is under an indictment for a felony to possess a firearm that had traveled in interstate commerce. Vance had indicated when he handed the .325 cartridge to Agent Heine after taking it out of the magazine that he had a larger rifle than Basham's .308. Since it was illegal for Steven Vance to possess a firearm, the second requirement of the plain view doctrine was met, in that the rifle's incriminating character was immediately apparent.

Agent Heine and Stephen Vance walked together and according to the testimony of Heine, after Vance had talked to his lawyer, Vance said, "Take it, do what you got to do." When they got back to the automobile, Heine told Vance he was going to seize the rifle but that he needed to give Vance a receipt for the firearm. Vance said he did not want it, and Heine later gave a receipt to Basham.

After Steven Vance talked to his lawyer, who obviously told him that he would have to give up the rifle, Vance told Heine to take the rifle, to do what he had to do. Heine then lawfully reached into the car and seized the rifle, the magazine and the cartridge the magazine contained.

The rifle, the magazine and the cartridge should not be suppressed.

**September 12, 2012, Contact.**

On September 12, 2012, Agent Heine and Forest Service Officer Paul Joyner went with the survey crew to the Dennis Vance property. Before, on September 11, the survey crew had been told

that they could not come onto the property and they had left without completing the survey.

The purpose of the Forest Service Agent's going to the Vance property on April 12 was to provide assistance and security to the survey crew. (Tr., p. 89).

In Defendant's Suggestions in Support of his Motion to Suppress (Document #61), the defendant does not point to any suppressible evidence obtained by Forest Service Officers on September 12, 2012. (Document #61, p. 21).

Special Agent Heine testified that the officers were not there to collect evidence. (Tr., p. 143). Heine was not there to question Steven Vance in regards to any activity. Id. Agent Heine testified he was there to tell Steven Vance not to interfere "with the next time we come back to do that, or he would be arrested." Id.

The only statement attributed to Mr. Vance was that the people he made contact with the day before were not real surveyors. (Tr., p. 97). Agent Heine was asked if immediately before Vance made the statement that the men were not real surveyors if Heine had asked Vance any questions. Heine responded, "No. No there was no questions asked at all." Id.

The transcript does not reveal that any physical evidence was seized by the Forest Service officer on September 12, 2012.

The court finds that no suppressible evidence was obtained by the law enforcement officers during the contact on September 12, 2012.

### Motion for Bill of Particulars and Notice of Alibi Defense with Suggestions in Support Thereof

Defendant has filed his Motion for Bill of Particulars and has given notice of an alibi defense.

At the evidentiary hearing on pretrial motions, the defendant took up his motion for bill of particulars. The defendant urged that the indictment alleges essentially that the crime of stealing timber from the government lands could have occurred at some time over a 42-month period, which makes it extremely difficult from defense counsel's perspective and that of defendant to adequately prepare for trial. Defendant's attorney has certain obligations on behalf of the defendant to comply with the rules regarding alibi. Defendant urged that it is almost impossible to account for all your time where a person would be located and who that person would be with over such a long time span. For those reasons, the defendant is asking the court for a bill of particulars to narrow down the time frame of when the government alleges the crime occurred, rather than between May of 2008 and in December of 2011, which is approximately a 42-month period.

Count I of the Indictment charges that "At a time unknown to the grand jury, but between May, 2008 and December 31, 2011 in Reynolds County, within the Eastern District of Missouri, the defendant, STEVEN WAYNE VANCE, willfully and knowingly did steal and purloin timber, of the value of more than $1,000, which was property of the United States, in violation of Title 18, United States Code, Section 641."

The government responded that the government has no evidence about what date a particular tree was cut or during what time frame the first cut was made or the last cut was made. They are general allegations, but there is no further information. The government stated that it does not have any further information, that it has actually supplied all of the reports that it has with the exception of banking records which the government is going to provide to defendant's attorney. The government stated that to the extent that defendant's attorney is asking for something else, the

government just does not have it.  (Tr., pp. 6-8).

The government stated that this has been an open file case.  All of the reports that the government has collected have been furnished to defendant's attorney with the exception of some grand jury materials or other records which the government feels it cannot turn over. Anything that the government would intend to use at trial, whether that be Jencks or Giglio material or Brady material, would be supplied to defendant's attorney.  (Tr., pp. 5-6).

The defendant's attorney acknowledged that in response to the motion for bill of particulars, the government's attorney states that he has provided defendant's attorney with all the information except for what he has stated, such as grand jury testimony, that he feels he is not able to provide. Defendant's attorney said that what is missing is a time frame for when allegedly timber was taken from government land by the defendant so that the defendant can provide an alibi, if available and appropriate.

The Assistant United States Attorney said that the government has provided as much information as it has about the time frame when the timber was allegedly stolen.  The indictment charges basically in May of 2008, timber was on the government land, but by December 31, 2011, it was gone.  As the defendant claims, he cannot account for every hour of a time period covering 42 months.  Neither can the government be expected to have set up surveillance 24/7 over four years.

At the evidentiary hearing, the Assistant United States Attorney indicated that he was providing to the defendant's attorney the bank records which the government had assembled.  The records show deposits in Mr. Vance's bank account for timber sales.  The Assistant United States Attorney said that was the closest the government could come to the actual dates the timber was taken.

The government has said it has provided all the information it has. It cannot be expected to provide information that it does not have.

Consequently, defendant's motion for bill of particulars with respect to a more precise time frame for when the timber was stolen will be denied. As far as any other information sought in the motion for bill of particulars is concerned, the defendant acknowledged at the evidentiary hearing that he has received or will receive information satisfying what the motion seeks. (Tr., p. 6). As a result, the defendant's motion for bill of particulars for information other than the time frame for the theft of the timber will be denied as moot.

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Dismiss Count II of the Indictment for Insufficiency and Failure to State a Cause of Action (Document #29) be denied.

**IT IS FURTHER RECOMMENDED** that defendant's Motion to Suppress (Document #30) be denied.

**IT IS FINALLY ORDERED** for defendant's Motion for Bill of Particulars (Document #31) be denied.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right

to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990).

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of November, 2013.